FELICIA GILBERT (SBN 276348)
Sanford Heisler Sharp, LLP
111 Sutter St., Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Fax: (415) 795-2021
Email: fgilbert@sanfordheisler.com

EDWARD CHAPIN (SBN 53287)
Sanford Heisler Sharp, LLP
2550 Fifth Ave., 11th Floor
San Diego, CA 92103
Telephone: (619) 577-4253
Fax: (619) 577-4250
Email: echapin@sanfordheisler.com

REBECCA A. OJSERKIS*
Sanford Heisler Sharp, LLP
111 S. Calvert St., Suite 1950
Baltimore, MD 21202
Telephone: (410) 834-7420
Fax: (410) 834-7425
Email: rojserkis@sanfordheisler.com
*pro hac vice forthcoming

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX HORN, LANCE AYTMAN, AND KEITH HOOKER,<br><br>Plaintiffs,<br><br>v.<br><br>KRAFT HEINZ FOODS COMPANY LLC,<br><br>Defendant. | No. _____<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

1. For most, the household name "Kraft Heinz" evokes images of fast food and barbeque staples garnished with the world's most iconic ketchup, or a quick and comforting bowl of mac and cheese. But for Plaintiffs Alex Horn, Lance Aytman, and Keith Hooker (collectively, "Plaintiffs"), the ubiquitous brand serves as a reminder of the years of anti-Black racism they

COMPLAINT

experienced:

2.    "No niggers as coordinators."

3.    "⊔⊓"

4.    "All niggers must go."

5.    "Quit or die niggers."

6.    These slurs are only a small selection of the harassment Plaintiffs suffered as plant workers at the Tulare, California dairy facility ("Tulare Plant" or "the Plant") operated by Kraft Heinz Foods Company LLC ("Defendant," "Kraft Heinz," or "the Company").

7.    Coworkers and supervisors alike egregiously harassed and discriminated against Plaintiffs during their many years of tenure.

8.    When confronted by Plaintiffs and other Black employees about these incidents, managers told Plaintiffs to keep their heads down or else they could join the unemployment line. The Plant's leadership acquiesced in the intolerably hostile environment and at times even claimed to be under orders from the Company's corporate offices to *avoid* investigating the Tulare Plant's rampant racism.

9.    Kraft Heinz was also complicit in perpetuating the Plant's anti-Black atmosphere through its hiring and promotion practices, which allowed subjectivity, bias and racial prejudice to dictate personnel decisions.

10.    Ultimately, Plaintiffs were forced out of work through the deterioration of their mental health and Kraft Heinz's actual or constructive termination of their employment.

11.    Although no monetary sum could restore the trust, dignity, and well-being that years of unmitigated racist abuse deprived them of, Plaintiffs seek recompense for the severe harm they have suffered with respect to their lost income and earning potential, as well as their ongoing emotional distress and its impact on their personal lives and relationships.

**<u>JURISDICTION AND VENUE</u>**

12.    Plaintiffs assert claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, as amended, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101

2

*et seq.*, thus conferring subject matter jurisdiction on this Court. *See* 28 U.S.C. §§ 1331, 1343(a).

13.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiffs are citizens of California. Defendant has co-headquarters in Illinois and Pennsylvania and is organized in Delaware. The amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). Plaintiffs' state and federal law causes of action arise from a common nucleus of operative facts, rendering the claims so related as to form part of the same case or controversy.

15.     Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e–5(f)(3). Kraft Heinz conducts business in this District, and the events and omissions giving rise to the claims alleged below substantially occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.     Plaintiffs timely filed *pro se* Charges with the Equal Employment Opportunity Commission ("EEOC") on, respectively, September 22, 2018 (Plaintiff Aytman), December 17, 2018 (Plaintiff Horn), and March 8, 2019 (Plaintiff Hooker). These Charges indicated Plaintiffs' intent to duly cross-file with the California Department of Fair Employment and Housing ("DFEH").

17.     Through legal counsel, Plaintiffs Horn and Aytman cross-filed with the EEOC and DFEH supplemental and expanded allegations on, respectively, April 6, 2020 (Plaintiff Horn) and April 28, 2020 (Plaintiff Aytman).

18.     Plaintiffs amended their Charges on April 20, 2021 to cure technical defects related to the Company's name and size.

19.     Plaintiffs have administratively exhausted their claims with the EEOC and DFEH.

## PARTIES

20.     **Plaintiff Alex Horn** is a resident of Tulare, California and a former employee of Kraft Heinz's Tulare Plant, where he began working in 2011 through a temp agency. Later that year, he was hired full-time as a Production Technician, in which he sanitized equipment and operated machinery.

COMPLAINT

21.     From 2012 to 2013, Horn was also a Back-up Coordinator, an understudy position to the supervisory role of Coordinator. While the Back-up Coordinator role carried additional responsibilities, it did not include any increase in compensation.

22.     Previously a general laborer and tiler, Horn decided to work at Kraft Heinz for the Company's brand reputation and for a shot at career progression. From the start of his employment, he aimed to obtain a managerial role. To that end, he regularly sought out opportunities to learn about the Company's business and suggested avenues to reduce costs and inefficiencies.

23.     Horn, who is Black and Latino, suffered years of race discrimination and harassment by his non-Black coworkers and managers. The abuse culminated in Horn's development of post-traumatic stress disorder (PTSD) and other mental health conditions, which necessitated a medical leave of absence. In September 2019, during this unpaid leave, Kraft Heinz fired Horn.

24.     **Plaintiff Lance Aytman** is a resident of Fresno, California and a former employee of Kraft Heinz's Tulare Plant, where he began working in 2011 through a temp agency. He was hired in 2012 as a Finished Goods Receiver only on a part-time basis. Finally, in 2013, he became a full-time employee as a Barrel Seal Technician and later a Draining & Matting Conveyor Operator.

25.     Prior to working at Kraft Heinz, Aytman held positions at a youth group and for the U.S. Census Bureau. He persistently tried to obtain full-time employment at Kraft Heinz because of the decent pay and the opportunities for his career development.

26.     But Aytman, who is Black, similarly endured years of race discrimination and harassment by his non-Black coworkers and managers. The abuse resulted in Aytman's development of anxiety and depression, requiring a medical leave of absence during which he was fired in July 2019.

27.     **Plaintiff Keith Hooker** is a resident of Fresno, California and a former employee of Kraft Heinz's Tulare Plant, where he worked from 1996 until his constructive discharge in June 2018.

28.     Hooker worked as a Barrel Seal Technician from 1996 until around 1999 or 2000, when he became a Lift Truck Operator. In this role, Hooker (un)loaded, inspected, and moved

deliveries and goods via truck throughout the facility's factory and yard.

29. Hooker initially joined Kraft Heinz because Tulare Plant jobs were considered to be relatively stable and decent-paying, and also because he wanted the opportunity to work at a large company with the potential for professional growth and advancement.

30. Hooker, who is Black, also experienced racism throughout his 22 years of employment with Kraft Heinz. Ultimately, noticing how the work environment had changed him as a person, Hooker felt compelled to leave the Company in 2018, despite being only a few years shy of his planned retirement after over two decades of service.

31. **Defendant Kraft Heinz Foods Company LLC ("Kraft Heinz")** is a food and beverage limited liability corporation registered in Delaware and co-headquartered in Chicago, Illinois, and Pittsburgh, Pennsylvania.

32. The Company is the third-largest food and beverage business in North America and the fifth-largest in the world. *A Platform for Performance*, Kraft Heinz (last visited Aug. 3, 2021), https://www.kraftheinzcompany.com/index.html. Kraft Heinz employs approximately 38,000 workers worldwide and boasts an annual revenue in excess of $26 billion. U.S. Sec. & Exch. Comm'n, Form 10-K, Kraft Heinz, at 1, 20 (Feb. 17, 2021), https://ir.kraftheinzcompany.com/static-files/30b5473e-816d-431c-b703-2ee8e2a10c64. Kraft Heinz ranked 110th in the 2021 Fortune 500 list of the largest U.S. corporations based on 2020 total revenue. *Kraft Heinz Company Profile*, Fortune (last visited Aug. 5, 2021), https://fortune.com/company/kraft-heinz/fortune500/.

33. Kraft Heinz operates numerous manufacturing and packaging facilities across California, including in Tulare.[1] The Tulare Plant specializes in the production of dairy products, including, but not limited to, a variety of cheeses. During Plaintiffs' employment, the Tulare Plant's staff grew to a few hundred permanent and temporary workers at any given time.

34. During all relevant times, Kraft Heinz was Plaintiffs' employer within the meaning

---

[1] Kraft Heinz has a pending sale of the Tulare Plant, along with other facilities, to another company. *See Kraft Heinz Announces Agreement to Sell Its Natural Cheese Business to Groupe Lactalis*, Kraft Heinz (Sept. 15, 2020), https://ir.kraftheinzcompany.com/news-releases/news-release-details/kraft-heinz-announces-agreement-sell-its-natural-cheese-business. Upon information and belief, that sale remains pending.

COMPLAINT

of all applicable federal and state laws.

**FACTUAL ALLEGATIONS**

35.    Plaintiffs were eager to work at Kraft Heinz because it had a reputation for paying reasonable wages and supplying overtime. The compensation allowed them to financially support their growing families in a community that offered few comparable opportunities for stable jobs where they could see themselves building careers.

36.    From the start of their employment, Plaintiffs learned that their decent paychecks came at a high price. The Tulare Plant was rife with anti-Black slurs, innuendos, threats, and discrimination.

37.    The anti-Black abuse came from peers *and* supervisors, who controlled whether Plaintiffs would receive promotions, transfers, and raises. Not surprisingly, the supervisors passed over Plaintiffs in favor of non-Black employees.

38.    Plaintiffs and other employees frequently made Kraft Heinz management and human resources ("HR") aware of the racism. Plant management acknowledged on numerous occasions that the Company's corporate office knew about the problems.

39.    Yet despite the continuation and escalation of the harassment and discrimination, the Company failed to take substantive actions adequately aimed to deter further misconduct or to safeguard Black employees.

40.    Kraft Heinz held a handful of townhalls, where its purported "zero tolerance" policy for racism was reiterated. But when harassment recurred, at times committed by or in front of supervisors, no corrective action was taken—revealing the toothless nature of the business's boilerplate policy.

41.    When Plaintiffs urged Kraft Heinz's Plant and corporate management to investigate incidents of harassment, they were shrugged off.

42.    Occasionally, the Company undertook pro forma investigations that they—at best, clumsily and at worst, intentionally—botched at every turn. Plaintiffs' suggestions for change were uniformly rejected, although the reasons for the rejections often shifted.

43.    The racially hostile status quo persisted for years and became more violent over

6

time.

44.     To protect their already damaged mental health and ensure their physical safety, Plaintiffs were unable to continue working at Kraft Heinz. Specifically, death threats forced Hooker to resign and Horn and Aytman to take medical leaves of absence in 2018.

45.     The next year, while they were still out on leave, since Kraft Heinz had done little to change the Plant's work environment, the Company pretextually fired Plaintiffs Horn and Aytman.

46.     As a result of their employment at Kraft Heinz, Plaintiffs have suffered and continue to suffer incalculable damage to their health, psyches, finances, and relationships.

**I.   Anti-Black racism plagued the Tulare Plant, rendering it a hostile work environment.**

47.     Throughout Plaintiffs' employment, Kraft Heinz maintained a hostile work environment for Black plant workers in Tulare. Specifically, between 2012 and 2018, nearly every day on the job presented new macro- and/or microaggressions against Black employees. The harassment was at no point in Plaintiffs' employment fully interrupted or abated. It continued, in varying degrees of frequency and severity, during this entire period.

48.     Despite being on repeated notice of these problems, Kraft Heinz did little to confront and address, let alone eliminate, this racism. This toxic culture was fostered, encouraged, and condoned by HR and management at the Plant and the Company.

49.     Racial epithets, dropped in both targeted and casual ways, and racist symbols were commonplace at the Plant. Non-Black employees frequently used the n-word in reference to specific Black coworkers and in general. Not only were supervisors made fully aware of these racist incidents from multiple Black employees' complaints, but they also personally witnessed the misconduct—and on some occasions *committed* it.

50.     The egregious and persistent racist harassment includes, but is not limited to, the examples that follow.

\*        \*        \*

51.     During Plaintiff Hooker's first few years on the job, a White coworker who had

7

grease on his face joked that he had stood "too close to Keith [Hooker]."

52.    In 2012, Plaintiff Horn found a note in his personal locker that read, "No niggers as coordinator." As the only Black employee with the title of Back-up Coordinator, Horn's solid work performance should have made him eligible for promotion to Coordinator. Kraft Heinz management took no corrective action after Horn turned in the note.

53.    Shortly thereafter, Horn's direct supervisor, Walter Mendez, informed him that someone had also written "No niggers as coordinator" on a communal calendar in the Company breakroom. Horn was never informed of any investigatory or corrective action taken in response.

54.    In another 2012 incident, then-Coordinator Wayne Findley exclaimed in the Company cafeteria, "Look everybody, look at the way we are sitting—all the white people are here, all the Mexicans are there, and that table right there [pointing to Horn], let's call them 'others.'" After Horn complained to HR Coordinator Rigo Ceja, his coworkers told him to "let it be," that "Wayne was a good worker," and that Wayne "never really said anything that was racist; he just said 'other.'"

55.    Also that year, swastikas were drawn on multiple Black employees' lockers. *See infra*. Only after Black workers banded together and confronted management did the Company respond: by holding a luncheon where Frank Woodson, a Black Plant Manager from a different site, lectured Black employees to keep their heads down.

COMPLAINT

56. At a Company holiday party in 2013, in full view of Plant Manager Laura Burns and other supervisors, Coordinator Matt Nino shouted, "Run, nigger, run!" when he saw then-San Francisco 49ers quarterback Colin Kaepernick on TV during a National Football League game. A Black employee later complained to Plant Manager Burns about this incident. Upon information and belief, no corrective action was ever taken against Coordinator Nino, who maintained his supervisory role.

57. This incident and other uses of the n-word were recounted in an anonymous letter to Plant Manager Burns, copies of which circulated around the Plant that year. The letter described how the "zero tolerance" policy for racist remarks was not enforced. It also stated that "[i]f the blacks that work here don't like being called black or others or whatever else they should all just quit because its [*sic*] going to happen . . . ."

58. This was the second anonymous letter that was addressed to Plant Manager Burns and that made the rounds at the Plant in 2013. The first letter named non-Black employees, including former-Coordinator Findley, who publicly made "jokes" invoking racial stereotypes— for example, not "say[ing] chicken in front of" Horn, bringing him "grape soda," and claiming he "smells like chicken grease or coco butter."

59. The harassment escalated further in 2012. Someone(s) broke into and vandalized Horn and another Black employee's vehicles parked in the Tulare Plant's parking lot, and urinated on Horn's front tire. Horn had to pay out of pocket to replace the stolen items and repair the damage.

60. Horn complained to Plant Manager Burns about how he was targeted for racial harassment. Rather than address his concerns, she told him to "give [the Company] some time" and threatened retaliation by informing him that if he retained legal counsel, he "could no longer work" at Kraft Heinz.

61. Around this period, "Alex [Horn] is a nigger and a snitch" was written on the wall of the men's bathroom. A maintenance mechanic informed Horn that management instructed him to paint over the graffiti since they "didn't want to make a big fuss about it." Upon information and belief, no other steps were taken.

62. Horn was regularly called a "rat" and a "snitch" for reporting racial harassment to

COMPLAINT

HR. Even his former manager, Coordinator Findley, threatened him, "Snitches need stiches."

63.    Non-Black employees flaunted racist expressive speech. In 2014, a non-Black employee, Tim Stemple, wore a sanitation mask that had been vandalized with "No niggers in Culture" written on it. (Culture was one of the Plant's departments.) Upon information and belief, management provided Stemple a new mask but issued no reprimand. In addition, Coordinator Findley regularly arrived at work with multiple Confederate flags or images of the same prominently displayed on his truck.

64.    In 2015, employees used the n-word in front of Horn and then snickered while looking at him to gauge his reaction.

65.    Around that time, then-Production Technician Pat Portner indicated that he did not want to be involved by telling Horn that he would not want to be labeled a "snitch" for fear of "having a target on [his] back."

66.    That same year, after Supervisor Luis Valdez spilled black ink on his hands while standing close to Horn and another Black employee, Coordinator Angel Jimenez remarked that Valdez, Horn, and the other Black employee were "triplets," implying that Valdez was now the same color as Horn and the other Black employee. Valdez laughed in response to Jimenez's inappropriate comment.

67.    In 2016, Horn complained about his reassignment to night shifts, his constant placement on defunct machines, and the heightened scrutiny to which he was subjected. He perceived this treatment as discriminatory. Again, rather than address his concerns, Horn was told by his then-supervisors, James Romero and Luis Valdez, "if [you] don't like it [you] can quit and get in the unemployment line."

68.    Another biased anonymous letter, this time directed at Plant Manager Chad Beuchel, circulated in 2016. The note criticized Aytman as "lazy" and "a cancer," while bringing up his race.

69.    In August 2017, Aytman's car—and his alone—was vandalized in the Company parking lot. When he asked Plant Manager Brian Bettencourt to see the security footage from that day, Bettencourt only showed him footage from different days. Later, Head of Security Harold Gonzalez informed Aytman that the memory card associated with the surveillance footage for that

COMPLAINT

day was the only one of the five memory cards that had been destroyed.

70.    A few months later, Aytman complained about harassment in correspondence to HR representative Dave Bogan, who was based out of Kraft Heinz's corporate office in Chicago. Aytman received no response to his communication.

71.    The pervasive racism took a more violent turn leading into 2018.

72.    In late 2017, a non-Black coworker commented that he had "enough ammo to shoot everyone at the Plant twice." Upon information and belief, that employee was allowed an early retirement rather than Kraft Heinz imposing any discipline.

73.    In February 2018, shots were fired outside the Tulare Plant. The identity(ies) and motivation(s) of the shooter(s) were never determined.

74.    In April 2018, Aytman found a note in his locker that read "All niggers must go." *See infra*. He immediately reported the note to Plant Manager Bettencourt, who said "[they] [could not] do much about it."

COMPLAINT

75.     In June 2018, Horn and another Black employee found notes in their lockers that said, "Sorry nigger" and "Quit or die nigger." *See infra*. Upon receiving the notes from Horn and the other worker, Plant management inspected the lockers of Hooker and Aytman to discover identical notes. (Hooker and Aytman were not at work that day.) To this day, Kraft Heinz's management never informed Aytman of this development, which he only learned about from Horn.

 

76.     Plaintiffs did not understand these to be idle threats. In addition to the February 2018 shooting, coworkers, such as Portner and Valdez, had military and law enforcement backgrounds and frequently boasted about their firearm collections. In the days following the June 2018 death threat notes, Horn's coworkers ominously called him a "snitch."

77.     Tulare Plant management collected the death threat notes and first sent them to their corporate office in Chicago, rather than law enforcement. When Horn asked his manager what would be done, Horn was told over fifty people had entered the locker room, and that interviewing everyone would be too unmanageable. A supervisor shared with Horn that corporate instructed the Plant management to *not* perform an investigation because they "[did not] want to disgruntle employees"—obviously meaning *non-Black* employees. Kraft Heinz merely offered another Plant-wide meeting on the Company's antidiscrimination policies.

78.     Horn and his family took matters into their own hands. Horn's relatives reported the death threats to the Tulare Police Department and the FBI. Upon information and belief, law

12

enforcement's investigation could not identify a suspect because, as one officer informed Aytman, too many people at Kraft Heinz had touched the note to allow for any fingerprint identification.

\*        \*        \*

79.     Collectively, these examples, which are not exhaustive, demonstrate the severe *and pervasive* anti-Black harassment suffered by Plaintiffs. Plaintiffs told the perpetrators, management, and human resources how offensive they found this conduct, to no avail. While Plaintiffs always hoped circumstances would improve, Kraft Heinz's indifference and complicity prevented such a reality from ever coming to pass. Kraft Heinz merely reiterated its boilerplate antidiscrimination policy at Plant-wide meetings and on occasion conducted perfunctory investigations.

80.     In July 2018, a Black employee discovered in the bathroom graffiti in the same handwriting as the death threats; the employee reported the graffiti to management. Upon information and belief, there was no follow up to investigate or address this incident.

81.     To Plaintiffs' knowledge, the only employee who was ever disciplined in possible connection with racial harassment was Wayne Findley. Findley was demoted from Coordinator around the time of his "other" comment. However, that remark is not necessarily the reason for Findley's demotion, as he was being investigated around the same time for misusing the Company's credit card.

**II. Plaintiffs were actually and constructively denied positions and raises because of their race and protected activities.**

82.     Throughout their employment, in addition to suffering egregious harassment, Plaintiffs Horn and Aytman were denied advancement and other career opportunities. Those decisions were made and controlled by the same people calling them the n-word.

83.     Kraft Heinz employed unreliable and subjective procedures that invited biases in selecting employees for promotions and lateral moves. These decisions were not tied to performance review processes or objective performance measures.

84.     Because promotions were often accompanied by increases in compensation, Kraft Heinz's practices caused and compounded compensation inequities that harmed Plaintiffs.

COMPLAINT

### A.  Plaintiff Alex Horn

85.     Horn was a high-performing, hardworking employee with great ambitions for his career at Kraft Heinz. He was committed to his professional growth at the Company, in large part because he wanted to create a better workplace culture for other Black employees.

86.     Horn consistently applied for promotions and transfers throughout his employment at the Tulare Plant—on at least an annual basis and sometimes more frequently. Horn was denied all sought opportunities. He was passed over for non-Black coworkers, who often had less experience than him. He was even subjected to a demotion, when he was forced to transition to night-shift schedule.

87.     Horn applied to transfer to lateral positions with more desirable work hours (dayshifts), a material term of his employment. For example, in 2015, he sought Dayshift Case Packer and Dayshift Resource positions.

88.     He also applied to serve as a Culture Coordinator/Lead, a position for which he was well-equipped given his experience as a Back-up Coordinator, on multiple occasions, including in 2015, January 2017, and December 2017.

89.     Horn's interviews were regularly a sham. His interviewers, who were non-Black, would eat, drink, and engage in other tasks while Horn answered their questions.

90.     Meanwhile, non-Black employees were primed for and offered promotions, even when they had committed racist abuse against Plaintiffs and other Black employees. For example, Angel Jimenez, who was notorious for harassing Black employees and using the n-word, was promoted to Coordinator. So too was Pat Portner, who had indicated to Horn that he would not be willing to get involved in complaints of abuse or discrimination.

91.     Horn's application denials were not a string of coincidences, nor were they due to a lack of skills or performance issues; they were the result of coordinated efforts by his managers to ensure that Horn would remain in a subordinate position throughout his tenure at the Plant.

92.     For example, in one of the 2013 anonymous letters addressed to management, a Tulare Plant employee disclosed that Findley instructed them to change their vote for Back-up Coordinator, when that position was up for re-selection, from Horn to "someone else." When Horn

learned this news, he took himself out of the running for the vote to avoid further stress and harassment. These abusers and/or their friends were then Horn's interviewers during later application cycles.

93.     Horn complained about the unfair promotion practices to HR Coordinator Patricia Melendez and Plant Manager Beuchel.

94.     Despite all the abuse he suffered, Horn remained committed to paying it forward and improving the Company's culture. He even volunteered to participate in a 2017 focus group to help investigate the Company's job interview practices. Although the focus group proposed several policy changes to improve Kraft Heinz's personnel decision processes, Plant Manager Bettencourt informed Horn that none of the group's recommendations were adopted.

**B.  Plaintiff Lance Aytman**

95.     Aytman's experiences with hiring and promotion discrimination started as soon as he joined the Tulare Plant in 2012. He started with a cohort of five other part-time temporary employees. Unlike his non-Black counterparts, Aytman was denied the same rotational opportunities within the Plant and was forced to train himself informally in most of his job duties.

96.     When Aytman's part-time cohort applied for full-time positions in early 2013, his interviewer shared that he was "the highest scoring applicant." Yet everyone except him was offered a full-time position. A Barrel Seal Technician who was on the hiring panel revealed to Aytman that he "had interviewed better than anyone else, but someone had instructed [the hiring panel] not to hire" him.

97.     In September 2013, Aytman was finally offered a full-time position. However, he could only secure employment on the Barrel Seal Team, a particularly physically laborious position that was widely considered undesirable by Aytman's colleagues.

98.     Thereafter, Aytman consistently from 2013 to 2016 applied for promotions to positions in various departments, including Logistics, Culture, Barrel Seal, Whey Side, and Resource. His applications were never granted.

99.     In 2014, Aytman reported to Plant Manager Burns what he considered Kraft Heinz's

1   unfair promotion practices. Far from taking his concerns seriously, Plant Manager Burns

2   patronizingly told Aytman that he "should feel lucky to have this job."

3       100.    This pattern of discrimination did not go unnoticed. Aytman again complained about

4   the discriminatory practices to Plant Manager Beuchel. After an unproductive meeting with an HR

5   representative, Plant Manager Beuchel said he would meet with Aytman's direct supervisor, Lino

6   Vidal.

7       101.    Then in or around Fall 2016, Vidal told Aytman he had "suffered enough" and

8   finally granted Aytman a slight raise.

9       **C. Keith Hooker**

10      102.    Due to biased hiring processes, Plaintiff Hooker anticipated further discrimination

11   and thus chose not to apply for any promotions during his two decades of service.

12      103.    His concerns were based on experience. For example, he recommended a handful

13   of Black personnel for full-time hire, but instead the Company hired non-Black employees with

14   fewer qualifications.

15   **III. Kraft Heinz discriminated and retaliated against Plaintiffs in assignments, level of**

16   **scrutiny, and discipline.**

17      104.    Plaintiffs all complained—in person and in writing—about the Plant's ongoing

18   racial harassment and discrimination. They regularly engaged in protected activity over the years

19   by reporting incidents to Plant management, Plant HR, and corporate HR. Plaintiffs put their job

20   security and personal safety at risk by raising concerns.

21      105.    Rather than remedying the Tulare Plant's hostile work environment, Kraft Heinz

22   subjected Plaintiffs to apathy and inaction, as well as further discrimination and retaliation.

23      106.    When Plaintiff Horn's colleagues learned that he had engaged in protected activity,

24   he experienced an escalation in the frequency and severity of harassment.

25      107.    Horn was placed on less desirable nightshifts and was forced to operate defunct

26   machines by supervisors with a history of contributing to the anti-Black work environment.

27      108.    Plaintiff Aytman also experienced increased harassment when word of his

28

COMPLAINT

complaints spread.

109.   Aytman was subjected to increased scrutiny and disciplined for behaviors that his non-Black comparators also engaged in but for which they were never disciplined. He was issued warnings for failure to monitor machinery that was later discovered to be faulty and which no one could have anticipated would cause production delays. In another instance, Aytman was issued warnings for things as innocuous and commonplace as making a personal purchase during the last ten minutes of his shift, after he had completed all his duties. On another occasion, Aytman's managers attempted to take advantage of year-old allegations related to his attendance and/or job performance in order to create enough examples to warrant issuing a disciplinary warning.

110.   In July 2015, Aytman inquired about participating in the Company's tuition reimbursement policy. Management told Aytman that he could not enroll due to an ongoing Company merger. Meanwhile, Aytman's non-Black colleagues were able to get their tuition reimbursements approved during the same time without any issues or pushback from management.

**IV. Kraft Heinz's hostile work environment induced psychological symptoms and disabilities that ultimately forced Plaintiffs out of work and that the Company failed to accommodate.**

111.   Working daily under threat of anti-Black harassment and violence took a substantial psychological toll on Plaintiffs.

112.   Despite the harmful impacts on their finances, Plaintiffs went on leave from or left Kraft Heinz as a last resort to safeguard their mental and physical well-being.

**A. Alex Horn**

113.   Over the years of his employment, Plaintiff Horn noticed how Kraft Heinz's work culture changed him. He was increasingly anxious and had lost his sunny disposition. His relatives noticed this transformation and the subsequent strain it put on his relationships.

114.   Due to the burglary of his car, the shooting at the Plant, and his abusive coworkers' flaunting of their firearms, Horn became fearful for his family's safety. He began taking extra precautions, such as purchasing home security systems.

115.   The June 2018 death threat left in his locker pushed Horn past a breaking point.

COMPLAINT

1  Following the discovery of that note, and his coworkers' subsequent harassment of him as a

2  "snitch," Horn suffered a panic attack at work.

3       116.   Shortly thereafter, his primary care physician placed him on medical leave. He was

4  diagnosed with Post-Traumatic Stress Disorder, Generalized Anxiety Disorder, and Major

5  Depressive Disorder.

6       117.   On April 24, 2019, Dr. Bobbie McDonald, Psy.D., a qualified medical evaluator,

7  attributed Horn's PTSD to the harassment he experienced at Kraft Heinz. She recommended that

8  the Company accommodate Horn's disability by switching him to a dayshift, accompanying him

9  to and from his car, and ensuring that he was no longer subjected to verbal and written harassment.

10  Horn's treating provider later endorsed similar accommodation requests.

11       118.   On or around June 30, 2019, Kraft Heinz informed Horn that it would not implement

12  *any* of these reasonable measures to accommodate Horn's disability.

13       119.   In addition, Kraft Heinz made no effort to engage Horn in an interactive process,

14  despite that fact that he emailed the Company's HR and management to express his interest in

15  returning to work. He also inquired about the status of the death threat investigation. The Company

16  told Horn the investigation was closed without providing any assurances about his safety.

17       120.   Horn sought and received workers' compensation for his work-induced PTSD.

18       121.   Horn still suffers anxiety attacks, nightmares, insomnia, crying episodes and

19  persistent fear concerning his personal and familial safety. Horn continues to receive psychological

20  treatment for his PTSD, anxiety, and depression.

21       122.   Seeing former coworkers in the small Tulare community triggers Horn's

22  psychological symptoms, leading him to stay largely secluded from public life even before the

23  COVID-19 pandemic.

24       123.   The changes to Horn's mood and personality damaged his familial and social

25  relationships. In particular, the impact working at Kraft Heinz had on Horn precipitated the

26  dissolution of his marriage.

27       124.   Horn never returned to Kraft Heinz from his unpaid medical leave. He remains fully

28  disabled and unable to work to this day.

COMPLAINT

**B. Lance Aytman**

125.     Kraft Heinz's hostile work environment similarly harmed Plaintiff Aytman's mental health.

126.     In 2016, Aytman went on leave for anxiety and depression caused by the hostile work environment at Kraft Heinz. Aytman's health care provider identified his anxiety and depression as "severe" and related to his current work environment and conditions. In correspondence with Kraft Heinz, Aytman's doctor recommended that he take about three months off from work. Kraft Heinz denied his request for short-term disability leave, rendering his leave unpaid.

127.     Following his receipt of a death threat in Spring 2018, Aytman returned to his primary care physician, who diagnosed him with depression and anxiety caused by workplace conditions. His doctor determined that Aytman was unable to perform his job functions.

128.     Aytman thus sought short-term disability leave and workers' compensation. Both requests were denied.

129.     Because his leave was unpaid, Aytman was eager to return to work and expressed this sentiment to HR representatives on several occasions in 2018 and 2019. But he first needed answers about the status of the death threat investigation and what steps were being taken to ensure his safety.

130.     Aytman was met with dismissive responses that the investigation was closed and that no further racist incidents had occurred since he departed in Spring 2018. However, Aytman knew this assertion to be false, in light of the Summer 2018 events that he had learned about from coworkers.

131.     Like with Horn, Aytman's requests for safety and mental health accommodations were ignored, and no efforts were made to engage him in an interactive process.

132.     Despite his strong desire to do so, Aytman also never returned to working at Kraft Heinz. He has suffered weight changes, lack of motivation and energy, irritability, and insomnia.

**C. Keith Hooker**

133.     After years of enduring racist harassment and hostility at the Tulare Plant, and

COMPLAINT

following the death threats made to Black employees in Spring 2018, Plaintiff Hooker felt compelled to leave Kraft Heinz to preserve his physical and mental health.

134.    Therefore, in May 2018, Hooker submitted a resignation letter, effective the next month. To avoid further confrontation, he framed his departure as a retirement. He did not, however, reap the benefits of retirement, such as a higher pension and greater 401(k), to which he would have been entitled with further service.

135.    Yet Kraft Heinz was made aware that Hooker was not leaving on good terms. In June 2018, he submitted a letter describing the mistreatment of Black employees at the Plant going back decades. He described the "hostile work environment" and referenced his past complaints.

136.    Since his constructive discharge at 57 years old, Hooker has been unable to find steady, comparable work. He has struggled to make a living through seasonal and part-time jobs and unemployment benefits. That Hooker sacrificed the economic stability he earned at Kraft Heinz for such a precarious financial situation evidences the toxicity of the Plant.

137.    Hooker has observed changes in his mood and relationships since he began working at Kraft Heinz. The harassment he suffered from those who should have been trusted colleagues has led him to keep his guard up. He continues to experience social isolation and finds it difficult to make and maintain friendships.

**V.  By pretextually firing Plaintiffs Horn and Aytman, Kraft Heinz discriminated and retaliated against them because of their race, disability, and protected activity.**

138.    Plaintiffs Horn and Aytman clearly and repeatedly stated that they wished to return to work, so long as their lives would no longer be under threat. Rather than agreeing to take basic measures to ensure Horn and Aytman a modicum of safety at work, or allow them to continue their medical leave unpaid, Kraft Heinz sought to terminate Plaintiffs Horn and Aytman. In Summer 2019, the Company fired them both on pretextual grounds.

**A. Alex Horn**

139.    Kraft Heinz terminated Plaintiff Horn on September 3, 2019, mere weeks after Horn received his first workers' compensation payment. He learned of this decision over a week later because it came by letter sent to his parents' house, an address he had not used for years.

140.     At no point did Kraft Heinz attempt to demonstrate that maintaining Horn's unpaid employment was an undue burden on its business. In fact, Kraft Heinz did not identify any basis at all for Horn's termination in his termination letter.

141.     Post hoc, Kraft Heinz has asserted that it terminated Horn because the Company received a report from his physician, Dr. Valerie Gibson, in which she claimed that he may have harmed someone if he were to return to work.

142.     Horn made no such threats. When prodded by Dr. Gibson, he shared that he feared for his *own* physical safety at the Tulare Plant and, when asked directly, that he did not own firearms but he confirmed that he knew people who did. As further evidence of its and Dr. Gibson's racial bias, Kraft Heinz did not bother to discuss with Horn in any capacity Dr. Gibson's unfounded accusations. The Company seized upon the stereotype of a "dangerous Black man" to rid itself of one of the Plant's most vocal whistleblowers.

143.     Moreover, Horn learned from an EEOC investigator months prior, in June 2019, that Kraft Heinz intended to terminate his employment.

144.     Since his termination, Horn's mental health conditions have rendered him disabled and unable to maintain employment.

**B. Lance Aytman**

145.     On June 25, 2019, Plaintiff Aytman received an email from Kraft Heinz informing him that he needed to submit updated medical paperwork by July 3, 2019 in order for the Company to assess his ability to return to work or extend his leave.

146.     This email claimed to have requested the medical documentation a few weeks earlier in a letter that Aytman never received. The July 3, 2019 email did not, however, address Aytman's recent inquiry about how Kraft would ensure a safe environment for him to return to work.

147.     Aytman had not been asked to resubmit medical certifications when he had previously extended his leave on multiple occasions.

148.     Aytman tried to schedule an appointment with his doctor as soon as possible to comply with Kraft Heinz's demand and short deadline. However, before he was able to meet with his doctor and return the requested paperwork, Kraft Heinz terminated him.

COMPLAINT

149.    Since his termination, Aytman has been unable to secure full-time employment and has suffered financially.

150.    Aytman's experience at Kraft Heinz forced him to reevaluate his career path, and at significant personal cost, he began taking pilot classes. Due to the COVID-19 pandemic, he has not yet been able to complete the training required for him to obtain a pilot's license.

**VI. Kraft Heinz Has Not Produced Plaintiffs' Complete Personnel Records and Wage Statements.**

151.    Pursuant to California Labor Code §§ 226, 432, and 1198.5, Plaintiffs, through counsel, requested on November 15, 2019 and January 14, 2020 copies of their personnel records and wage statements.

152.    By February 13, 2020, Kraft Heinz had produced some records.

153.    However, Defendant's production has been deficient. For example, Kraft Heinz did not include all documents that are properly considered part of an employee's "personnel record," such as all termination records and promotion and transfer applications. It also did not produce all medical records or records related to Plaintiffs' complaints. Additional documents were produced to Plaintiffs Horn and Aytman in their workers' compensation cases as part of their "personnel records" than were produced in this matter. Moreover, Defendant has not provided wage statements for the entirety of Plaintiffs' employment, nor have they confirmed or denied whether such records are retained.

154.    On March 25, 2021, Plaintiffs, through counsel, submitted a second request for personnel records and wage statements to which they were statutorily entitled. The requested documents included materials related to Plaintiffs' medical records, terminations, and harassment complaints.

155.    On April 9, 2021, Kraft Heinz's counsel represented that the Company would not provide the requested records except through discovery in litigation.

COMPLAINT

**CAUSES OF ACTION**

**COUNT I**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"),

Hostile Work Environment

(On Behalf of Plaintiffs)

156.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

157.    Defendant Kraft Heinz, Plaintiffs' employer within the meaning of Title VII, subjected Plaintiffs to a pattern of harassing and discriminatory behavior based upon their race and/or substantially assisted, encouraged, condoned, and failed to remedy the continued harassment, creating a hostile work environment.

158.    The pattern of discriminatory harassment continued from the beginning of Plaintiffs' employment until their constructive and actual discharges in 2018 and 2019, respectively. The severe and pervasive racial harassment was similar in kind, occurred with relative frequency, and was perpetrated and exacerbated by numerous employees and supervisors, including numerous repeat bad actors. As a result of the continuous nature of Defendant's discriminatory conduct persistent throughout Plaintiffs' employment, the harassment collectively constituted a singular unlawful employment practice. Thus, Plaintiffs are entitled to application of the continuing violations doctrine to all violations alleged herein.

159.    The severe and/or pervasive harassment sufficiently altered the conditions of Plaintiffs' employment.

160.    Tulare Plant workers directed anti-Black insults, slurs, jokes, and comments at Plaintiffs because of their race.

161.    The unlawful conduct was engaged in and/or ratified by supervisors and/or managing agents of Kraft Heinz, who were acting at all relevant times within the scope and course of their employment.

162.    The behavior was unwanted, without consent, objected to, and offensive.

163.    Reasonable employees would have believed that Plaintiffs' work environment was abusive and/or hostile. Plaintiffs believed their work environment was abusive and/or hostile.

164.    Plaintiffs complained to Defendant's Plant and corporate management about workplace discrimination and harassment.

165.    Defendant's management negligently failed to undertake, and/or ineffectually undertook, prompt remedial action reasonably calculated to end the harassing conduct against Plaintiffs, of which they had notice.

166.    Defendant committed the acts herein alleged maliciously and oppressively in conscious disregard for Plaintiffs' rights.

167.    The unlawful conduct caused, and continues to cause, Plaintiffs to suffer shock, embarrassment, humiliation, stress, depression, anxiety, fear, uncertainty, loss of confidence, and other economic and emotional distress damages to be proven at trial.

168.    Plaintiffs request relief as hereinafter described.

**COUNT II**

Title VII, Discrimination

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

169.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

170.    Defendant intentionally discriminated against Plaintiffs Horn and Aytman on the basis of their race by wrongfully terminating their employment in 2019, while both were on leave.

171.    Defendant's purported reasons for terminating Plaintiffs Horn and Aytman—Dr. Gibson's accusations and a lack of medical documentation, respectively—are pretextual.

172.    Defendant's discriminatory actions caused, and continue to cause, Plaintiffs Horn and Aytman to suffer damages including, but not limited to, lost earnings, lost benefits, and other financial losses, as well as humiliation, embarrassment, emotional distress, and mental anguish.

173.    Plaintiffs request relief as hereinafter described.

**COUNT III**

Title VII, Retaliation

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

174.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

175.    Defendant retaliated against Plaintiffs Horn and Aytman because they engaged in

COMPLAINT

1   protected activities by submitting oral and written complaints to the Company's management and

2   HR about workplace discrimination and harassment.

3       176.    Defendant knew and/or should have known of the discrimination and harassment.

4       177.    Defendant subjected Plaintiffs Horn and Aytman to adverse actions, including

5   maintenance of a hostile environment, faulty machinery and undesirable shift assignments,

6   increased scrutiny, promotion and transfer denials, and terminations, because of Plaintiffs Horn and

7   Aytman's harassment and discrimination complaints.

8       178.    As a result of Defendant's retaliation, Plaintiffs Horn and Aytman suffered, and

9   continue to suffer, harm, including economic losses and emotional distress, in an amount to be

10  determined at trial.

11      179.    Plaintiffs request relief as hereinafter described.

12  **COUNT IV**

13  Title VII, Constructive Discharge

14  (On Behalf of Plaintiff Keith Hooker)

15      180.    Plaintiff re-alleges and incorporates the preceding paragraphs as alleged above.

16      181.    But for the hostile work environment suffered by Plaintiff Hooker and set forth

17  above, he would not have been forced to involuntarily depart from his employment. He would have

18  continued working at Kraft Heinz until his planned retirement if not for the escalating racial

19  harassment.

20      182.    No reasonable person in similar situation would have had any option but to separate

21  from their employment.

22      183.    Defendant's (in)actions caused, and continue to cause, Plaintiff Hooker to suffer

23  financial struggles, pain, embarrassment, mental anguish, psychological harm, and humiliation.

24      184.    Plaintiff requests relief as hereinafter described.

25  **COUNT V**

26  42 U.S.C. § 1981, Hostile Work Environment

27  (On Behalf of Plaintiffs)

28      185.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

25

186.   Defendant denied Plaintiffs the same right to make and enforce contracts as enjoyed by their non-Black coworkers, including rights involving the making, performance, modification, and termination of contracts with Defendant, as well as the enjoyment of all benefits, privileges, terms and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

187.   Defendant Kraft Heinz subjected Plaintiffs to a pattern of harassing and discriminatory behavior based upon their race and/or substantially assisted, encouraged, condoned, and failed to remedy the continued harassment, creating a hostile work environment.

188.   The pattern of discriminatory harassment continued from the beginning of Plaintiffs' employment until their constructive and actual discharges in 2018 and 2019, respectively. The severe and pervasive racial harassment was similar in kind, occurred with relative frequency, and was perpetrated and exacerbated by numerous employees and supervisors, including numerous repeat bad actors. As a result of the continuous nature of Defendant's discriminatory conduct persistent throughout Plaintiffs' employment, the harassment collectively constituted a singular unlawful employment practice. Thus, Plaintiffs are entitled to application of the continuing violations doctrine to all violations alleged herein.

189.   The severe and/or pervasive harassment sufficiently altered the conditions of Plaintiffs' employment.

190.   Tulare Plant workers directed anti-Black insults, slurs, jokes, and comments at Plaintiffs because of their race.

191.   The unlawful conduct was engaged in and/or ratified by supervisors and/or managing agents of Kraft Heinz, who were acting at all relevant times within the scope and course of their employment.

192.   The behavior was unwanted, without consent, objected to, and offensive.

193.   Reasonable employees would have believed that Plaintiffs' work environment was abusive and/or hostile. Plaintiffs believed their work environment was abusive and/or hostile.

194.   Plaintiffs complained to Defendant's Plant and corporate management about workplace discrimination and harassment.

195.     Defendant's management negligently failed to undertake, and/or ineffectually undertook, prompt remedial action reasonably calculated to end the harassing conduct against Plaintiffs, of which they had notice.

196.     Defendant committed the acts herein alleged maliciously and oppressively in conscious disregard for Plaintiffs' rights.

197.     The unlawful conduct caused, and continues to cause, Plaintiffs to suffer shock, embarrassment, humiliation, stress, depression, anxiety, fear, uncertainty, loss of confidence, and other economic and emotional distress damages to be proven at trial.

198.     Plaintiffs request relief as hereinafter described.

**COUNT VI**

42 U.S.C. § 1981, Discrimination

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

199.     Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

200.     Defendant intentionally discriminated against Plaintiff Horn, *inter alia*, on the basis of his race by denying him contracts to work or deterring him from work opportunities by, among other things:

   a.   Utilizing biased transfer and promotion systems;

   b.   Utilizing an associated biased compensation system; and

   c.   Failing to take reasonable and adequate steps to prevent and correct the use of unreliable, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

201.     Defendant's intentional discrimination against Plaintiff Horn interfered with his rights to make and enforce work contracts.

202.     Defendant's policy and practice of denying work opportunities based on race harmed Plaintiff Horn and constituted unlawful race discrimination in the making and enforcing of contracts in violation of 42 U.S.C. § 1981.

203.     Defendant also wrongfully terminated Plaintiffs Horn and Aytman's employment contracts in 2019, while both were on leave, because of their race.

27

204.    Defendant set and/or maintained the above-described discriminatory policies, patterns, and/or practices within and outside the limitations period.

205.    Defendant's conduct caused, and continues to cause, Plaintiffs Horn and Aytman substantial harm, including lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional distress, and mental anguish.

206.    Plaintiffs request relief as hereinafter described.

**COUNT VII**

42 U.S.C. § 1981, Retaliation

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

207.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

208.    Defendant retaliated against Plaintiffs Horn and Aytman because they engaged in protected activities by submitting oral and written complaints to management and HR about workplace discrimination and harassment.

209.    Defendant knew and/or should have known of the discrimination and harassment.

210.    Defendant subjected Plaintiffs Horn and Aytman to adverse actions, including maintenance of a hostile environment, machinery and shift assignments, increased scrutiny, promotion and transfer denials, and terminations, because of Plaintiffs Horn and Aytman's harassment and discrimination complaints.

211.    As a result of Defendant's retaliation, Plaintiffs Horn and Aytman suffered, and continue to suffer, harm, including economic losses and emotional distress, in an amount to be determined at trial.

212.    Plaintiffs request relief as hereinafter described.

**COUNT VIII**

42 U.S.C. § 1981, Constructive Discharge

(On Behalf of Plaintiff Keith Hooker)

213.    Plaintiff re-alleges and incorporates the preceding paragraphs as alleged above.

214.    But for the hostile work environment suffered by Plaintiff Hooker and set forth above, he would not have been forced to involuntarily depart from his employment.

215. He would have continued working at Kraft Heinz until his planned retirement if not for the escalating racial harassment.

216. No reasonable person in similar situation would have had any option but to separate from their employment.

217. Defendant's (in)actions caused, and continue to cause, Plaintiff Hooker to suffer financial struggles, pain, embarrassment, mental anguish, psychological harm, and humiliation.

218. Plaintiff requests relief as hereinafter described.

**COUNT IX**

Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 *et seq.* ("ADA"),

Failure to Provide Reasonable Accommodations

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

219. Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

220. At all times relevant to this action, Plaintiffs Horn and Aytman were qualified individuals with disabilities, as the ADA defines those terms. Defendant knew that Plaintiffs Horn and Aytman suffered mental health conditions that their health care providers attributed to Defendant's workplace environment.

221. Prior to their medical leaves, Plaintiffs met or exceeded legitimate expectations of performance and were able to perform the essential functions of their jobs.

222. Plaintiffs Horn and Aytman directly and/or through their health care providers requested reasonable accommodations so that they could return to work and continue performing their essential job requirements.

223. Plaintiffs Horn and Aytman were willing to participate in an interactive process to determine whether and what reasonable accommodations were possible, but Defendant failed to timely engage them in good-faith interactive processes.

224. Reasonable accommodations existed that would have allowed Plaintiffs Horn and Aytman to return to performing their essential job functions and that would not have posed undue burdens on Defendant.

225. Defendant's failure to engage in good-faith interactive processes substantially

COMPLAINT

caused the emotional and financial harms that Plaintiffs Horn and Aytman experienced on unpaid medical leave and as a result of their terminations.

226.    Defendant's actions caused, and continue to cause, Plaintiffs Horn and Aytman to suffer pain, mental anguish, emotional distress, loss of earnings, other employment benefits, and other economic damages related to their respective terminations.

227.    Plaintiffs request relief as hereinafter described.

**COUNT X**

ADA, Retaliation

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

228.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

229.    At all times relevant to this action, Plaintiffs Horn and Aytman were qualified individuals with disabilities, as the ADA defines those terms. Defendant knew that Plaintiffs Horn and Aytman suffered mental health conditions that their health care providers attributed to Defendant's workplace environment.

230.    Prior to their medical leaves, Plaintiffs met or exceeded legitimate expectations of performance and were able to perform the essential functions of their jobs.

231.    In 2016 and 2018 to 2019, Plaintiff Aytman took medical leave as a reasonable accommodation for his disability. In 2018 to 2019, Plaintiff Horn did the same.

232.    Plaintiffs Aytman and Horn sought, but did not receive, reasonable accommodations for their disabilities that would allow them to return to work.

233.    Plaintiffs Horn and Aytman were subjected to increased scrutiny and termination in retaliation for their protected leaves.

234.    Defendant intentionally and willfully retaliated against Plaintiffs Horn and Aytman because of their requests for reasonable accommodations.

235.    Plaintiffs Horn and Aytman's requests for reasonable accommodations were a substantial motivating factor in Defendant's decisions to terminate their employment.

236.    Defendant's actions caused, and continue to cause, Plaintiffs Horn and Aytman to suffer pain, mental anguish, emotional distress, loss of earnings, other employment benefits, and

other economic damages related to their respective terminations.

**COUNT XI**

California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(j)–(k),

Hostile Work Environment

(On Behalf of Plaintiffs)

237. Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

238. Defendant Kraft Heinz subjected Plaintiffs to a pattern of harassing and discriminatory behavior based upon their race and/or substantially assisted, encouraged, condoned, and failed to remedy the continued harassment, creating a hostile work environment.

239. The pattern of discriminatory harassment continued from the beginning of Plaintiffs' employment until their constructive and actual discharges in 2018 and 2019, respectively. The harassment was similar and related, occurred with reasonable frequency, and had not yet acquired permanence by the time Plaintiffs filed Charges of Discrimination.

240. By reason of the continuous nature of Defendant's discriminatory conduct persistent throughout Plaintiffs' employment, they are entitled to application of the continuing violations doctrine to all violations alleged herein.

241. The severe and/or pervasive harassment sufficiently altered the conditions of Plaintiffs' employment.

242. Tulare Plant workers directed anti-Black insults, slurs, jokes, and comments at Plaintiffs because of their race.

243. The unlawful conduct was engaged in and/or ratified by supervisors and/or managing agents of Kraft Heinz, who were acting at all relevant times within the scope and course of their employment.

244. The behavior was unwanted, without consent, objected to, and offensive.

245. Reasonable employees would have believed that Plaintiffs' work environment was abusive and/or hostile.

246. Plaintiffs believed their work environment was abusive and/or hostile.

247. Plaintiffs complained to Defendant's Plant and corporate management about

COMPLAINT

workplace discrimination and harassment.

248.    Defendant's management failed to undertake, and/or ineffectually undertook, prompt and appropriate reasonable steps to prevent the harassing conduct against Plaintiffs, of which they had notice.

249.    Defendant committed the acts herein alleged maliciously and oppressively in conscious disregard for Plaintiffs' rights.

250.    The unlawful conduct caused Plaintiffs to suffer shock, embarrassment, humiliation, stress, depression, anxiety, fear, uncertainty, loss of confidence, and other economic and emotional distress damages to be proven at trial.

251.    Plaintiffs request relief as hereinafter described.

**COUNT XII**

FEHA, Cal. Gov't Code § 12940(a), Discrimination

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

252.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

253.    Defendant intentionally discriminated against Plaintiff Horn, *inter alia*, on the basis of his race in violation of the FEHA by, among other things:

    a.  Utilizing biased transfer and promotion systems;

    b.  Utilizing an associated biased compensation system; and

    c.  Failing to take reasonable and adequate steps to prevent and correct the use of unreliable, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

254.    These policies are intended to and do have the effect of:

    a.  Denying Black employees business opportunities because of their race;

    b.  Failing to promote them because of their race;

    c.  Compensating them less because of their race;

    d.  Evaluating their performance more negatively because of their race; and

    e.  Providing them with inferior terms and conditions of employment as a result of increased scrutiny because of their race.

255.     Defendant's reliance on illegitimate and unvalidated systems and a lack of criteria to select individuals for promotion, set compensation, and determine other terms, conditions, and privileges of employment adversely impacted Black workers in violation of FEHA and are not, and cannot be justified by business necessity.

256.     Even if such systems and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

257.     Defendant also discriminated against Plaintiffs Horn and Aytman by wrongfully terminating their employment in 2019, while both were on leave.

258.     The discriminatory acts occurred both within and outside the limitations period in this case. Defendant set and/or maintained these discriminatory policies, patterns, and/or practices during the limitations period within the state of California.

259.     Defendant's discriminatory actions, policies, and/or practices caused, and continue to cause, Plaintiffs Horn and Aytman to suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional distress, and mental anguish.

260.     Plaintiffs request relief as hereinafter described.

**COUNT XIII**

FEHA, Cal. Gov't Code § 12940(h), Retaliation

(On Behalf of Plaintiffs Alex Horn and Lance Aytman)

261.     Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

262.     Defendant retaliated against Plaintiffs Horn and Aytman because they complained about workplace harassment and discrimination.

263.     Plaintiffs Horn and Aytman engaged in protected activities by complaining to Defendant's management and HR representatives about workplace discrimination.

264.     Defendant knew and/or should have known of the discrimination and harassment.

265.     Defendant subjected Plaintiffs Horn and Aytman to adverse actions, including maintenance of a hostile environment, machinery and shift assignments, increased scrutiny, promotion denials, and terminations, because of Plaintiffs Horn and Aytman's harassment and

1   discrimination complaints.

2   266.   Defendant's retaliation caused, and continues to cause, Plaintiffs Horn and Aytman

3   to suffer harm, including economic losses and emotional distress, in an amount to be determined at

4   trial.

5   267.   Plaintiffs request relief as hereinafter described.

6   **COUNT XIV**

7   FEHA, Cal. Gov't Code § 12940(m), Failure to Make Reasonable Accommodations

8   (On Behalf of Plaintiffs Alex Horn and Lance Aytman)

9   268.   Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

10   269.   Defendant knew that Plaintiffs Horn and Aytman suffered mental health conditions

11   that their health care providers attributed to Defendant's workplace environment.

12   270.   Defendant was aware of reasonable accommodations those providers outlined for

13   Plaintiffs Horn and Aytman to return to work. Those accommodations did not pose an undue

14   hardship to Defendant's operation.

15   271.   Plaintiffs were able to perform the essential functions of their jobs, with reasonable

16   accommodations for their psychological conditions. They had been performing their job duties at

17   equal or higher levels than other employees prior to their medical leaves.

18   272.   Defendant failed to provide Plaintiffs Horn and Aytman the most basic of reasonable

19   accommodations, including but not limited to: failing to properly investigate and address death

20   threats, refusing to shift Plaintiff Horn to a dayshift, and terminating them instead of allowing them

21   to remain on unpaid leave.

22   273.   Plaintiffs Horn and Aytman's mental health conditions were substantial motivating

23   reasons for Defendant's actions.

24   274.   Plaintiffs request relief as hereinafter described.

25   **COUNT XV**

26   FEHA, Cal. Gov't Code § 12940(n), Failure to Engage in Interactive Process

27   (On Behalf of Plaintiffs Alex Horn and Lance Aytman)

28   275.   Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

34

276.     Defendant knew that Plaintiffs Horn and Aytman suffered mental health conditions that their health care providers attributed to Defendant's workplace environment.

277.     Plaintiffs Horn and Aytman were willing to participate in an interactive process to determine whether and what reasonable accommodations were possible, but Defendant failed to timely engage them in good-faith interactive processes.

278.     Defendant's failures to engage in good-faith interactive processes were substantial causes of the emotional and financial harms Plaintiffs Horn and Aytman experienced during their leaves and as a result of their terminations.

279.     Plaintiffs request relief as hereinafter described.

**COUNT XVI**

FEHA, Cal. Gov't Code § 12940(a), Constructive Discharge

(On Behalf of Plaintiff Keith Hooker)

280.     Plaintiff re-alleges and incorporates the preceding paragraphs as alleged above.

281.     Without the hostile work environment suffered by Plaintiff Hooker and set forth above, he would not have been forced to involuntarily depart from his employment. He would have continued working at Kraft Heinz until his planned retirement if not for the escalating racial harassment.

282.     No reasonable person in similar situation would have had any option but to separate from their employment.

283.     Defendant's (in)actions caused, and continue to cause, Plaintiff Hooker to suffer financial struggles, pain, embarrassment, mental anguish, psychological harm, and humiliation.

284.     Plaintiff requests relief as hereinafter described.

**COUNT XVII**

Ralph Civil Rights Act of 1976, Cal. Civ. Code § 51.7

(On Behalf of Plaintiffs)

285.     Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

286.     Defendant and its employees intentionally threatened violent acts, such as issuing death threats containing the n-word, against Plaintiffs.

287.   The substantial motivating reason for these threatening notes was Plaintiffs' race.

288.   Plaintiffs were intimidated by these threats and believed that these threats would be carried out. A reasonable person in their position would feel the same. For example, a shooting had occurred at the Tulare Plant, and Plaintiffs' coworkers who used the n-word also referenced their ownership of firearms.

289.   The Company had a practice of ratifying these intentional harms committed by its employees through its own inaction.

290.   As a substantial result of these threats, Plaintiffs experienced, and continue to experience, significant psychological, relational, and economic harm.

291.   Plaintiffs request relief as hereinafter described.

<strong>COUNT XVIII</strong>

Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1

(On Behalf of Plaintiffs)

292.   Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

293.   Defendant and its employees intentionally interfered with Plaintiffs' civil rights by credibly threatening them with violence and intimidating them through written and verbal threats.

294.   The threats and intimidation caused Plaintiffs to reasonably believe that violence could and would be committed against them if they exercised their rights to be free from race discrimination and harassment and their rights to object to such conduct. For example, Plaintiffs experienced an uptick in harassment and veiled threats of violence after complaining about racial harassment.

295.   The Company had a practice of ratifying these intentional harms committed by its employees through its own inaction.

296.   As a substantial result of these threats, Plaintiffs experienced, and continue to experience, significant psychological, relational, and economic harm.

297.   Plaintiffs request relief as hereinafter described.

COMPLAINT

**COUNT XIX**

Wrongful Discharge in Violation of Public Policy

(On Behalf of Plaintiffs Horn and Aytman)

298.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

299.    Defendant discharged Plaintiffs Horn and Aytman from their employment in 2019.

300.    Plaintiffs Horn and Aytman's discrimination and harassment complaints, as well as their pursuit of workers' compensation, were substantial motivating reasons for their discharges.

301.    Plaintiffs Horn and Aytman's terminations violate the fundamental public policy contained in the FEHA that employees are to be free from discrimination on the basis of race and disability and from retaliation for reporting race-based discrimination.

302.    Their discharges substantially resulted in Plaintiffs Horn and Aytman's significant psychological, relational, and economic harm.

303.    Plaintiffs request relief as hereinafter described.

**COUNT XX**

Negligent Infliction of Emotional Distress

(On Behalf of Plaintiffs Horn and Aytman)

304.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

305.    Defendant, by its (in)actions, was negligent in creating and maintaining a workplace at the Tulare Plant that was rife with race discrimination and harassment. These conditions forced Plaintiffs Horn and Aytman onto medical leaves.

306.    The Company was then negligent in terminating Plaintiffs Horn and Aytman during their medical leaves. Defendant negligently failed to verify inaccurate accusations with respect to Plaintiff Horn, or even give him an opportunity to address them. Defendant negligently failed to allow Aytman adequate time to respond to the Company's request for updated medical documentation.

307.    As a substantial result of Defendant's negligence, Plaintiffs Horn and Aytman suffered serious emotional distress, including but not limited to anxiety, worry, humiliation, fear, and shame. The distress was to a degree with which a reasonable person would not be able to cope.

308.   Plaintiffs request relief as hereinafter described.

## COUNT XXI

### Negligent Hiring, Supervision, and/or Retention of Employees

### (On Behalf of Plaintiffs Horn and Aytman)

309.   Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

310.   Defendant hired, supervised, and retained employees that engaged in race harassment and discrimination and/or who failed to address it. These employees include, but are not limited to, Pat Portner, James Romero, Luis Valdez, Rigo Ceja, Wayne Findley, Matt Nino, Brian Bettencourt, Chad Beuchel, and Laura Burns.

311.   The above employees were not fit to perform the work they were hired to do given that they created, contributed to, and/or failed to correct the hostile work environment. The Company's unfit employees negligently terminated Plaintiffs Horn and Aytman while they were on medical leaves as a result of the hostile work environment.

312.   Defendant knew or should have known that the above employees were not fit and/or competent employees and actually created risks that harmed Black employees, including Plaintiffs Horn and Aytman. Plant management witnessed numerous incidents of harassment and received many complaints from Plaintiffs Horn and Aytman and other Black employees. Corporate management also received complaints of harassment.

313.   As a substantial result of Defendant's negligence, Plaintiffs suffered serious emotional distress, including but not limited to anxiety, worry, humiliation, fear, and shame. The distress was to a degree with which a Black person could not reasonably cope.

314.   Plaintiffs request relief as hereinafter described.

## COUNT XXII

### Failure of Employer to Permit Former Employee a Copy of Personnel Records, Cal. Lab. Code § 1198.5

### (On Behalf of Plaintiffs)

315.   Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

316.   Through counsel, Plaintiffs requested their personnel records and wage statements

COMPLAINT

on November 15, 2019 and January 14, 2020, and March 25, 2021.

317.    Defendant has refused to provide complete productions and to aver whether documents are being withheld, have been destroyed, or do not otherwise exist.

318.    Consequently, Defendant knowingly and willingly denied Plaintiffs' lawful requests to avoid further consequence of its malfeasance, and in an attempt to deny Plaintiffs' their rights under the law.

319.    Due to Defendant's conduct, omissions, and failures, Plaintiffs are entitled to statutory penalties, costs, and attorney's fees pursuant to Cal. Lab. Code § 1198.5(k)–(*l*).

<b>COUNT XXIII</b>

Failure of Employer to Permit Former Employee a Copy of Pay Records, Cal. Lab. Code § 226

(On Behalf of Plaintiffs)

320.    Plaintiffs re-allege and incorporate the preceding paragraphs as alleged above.

321.    Through their counsel, Plaintiffs requested their wage statements on November 15, 2019 and January 14, 2020, and March 25, 2021.

322.    Defendant refused to provide wage statements prior to 2017 and to confirm whether wage statements predating 2017 remained in Defendant's possession or whether and when they had been destroyed.

323.    Upon belief, Defendant has knowingly failed to produce existing records and/or has destroyed such records subsequent to its obligations to retain them.

324.    Consequently, Defendant knowingly and willingly denied Plaintiffs' lawful requests to avoid further consequence of its malfeasance, and in an attempt to deny Plaintiffs' their rights under the law.

325.    Due to Defendant's conduct, omissions, and failures, Plaintiffs are entitled to actual damages, statutory penalties, costs, and attorney's fees pursuant to Cal. Lab. Code § 226(e)–(f), (h).

<b><u>ALLEGATIONS REGARDING RELIEF</u></b>

326.    Defendant's actions have caused and continue to cause Plaintiffs substantial losses in employment opportunities, earnings, and other employment benefits.

39

327.    Plaintiffs suffered and continue to suffer emotional distress, humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

328.    Defendant performed the acts herein alleged with malice, reckless indifference, and/or oppression to Plaintiffs and their legal rights. Plaintiffs are thus entitled to recover punitive damages in an amount according to proof.

## **PRAYER FOR RELIEF**

329.    Plaintiffs request the following relief:

a.   Acceptance of jurisdiction of this cause;

b.   A declaratory judgment that Defendant's employment practices challenged herein are illegal and in violation of the statutes as herein alleged;

c.   Nominal, compensatory, and punitive damages in excess of $30 million;

d.   Other equitable damages, including, but not limited to, front pay;

e.   An award of litigation costs and expenses, including reasonable attorney's fees to the Plaintiffs, including under 42 U.S.C. § 1988;

f.   Pre- and post-judgment interest at the maximum legal rate for all sums awarded; and

g.   Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury in this action.


Dated: August 19, 2021                         Respectfully submitted,

                                               /s/ Felicia Gilbert
                                               FELICIA GILBERT (SBN 276348)
                                               Sanford Heisler Sharp, LLP
                                               111 Sutter St., Suite 975
                                               San Francisco, CA 94104
                                               Telephone: (415) 795-2020
                                               Fax: (415) 795-2021
                                               Email: fgilbert@sanfordheisler.com

                                               EDWARD CHAPIN (SBN 53287)
                                               Sanford Heisler Sharp, LLP

COMPLAINT

2550 Fifth Ave., 11th Floor
San Diego, CA 92103
Telephone: (619) 577-4253
Fax: (619) 577-4250
Email: echapin@sanfordheisler.com

REBECCA A. OJSERKIS*
Sanford Heisler Sharp, LLP
111 S. Calvert St., Suite 1950
Baltimore, MD 21202
Telephone: (410) 834-7420
Fax: (410) 834-7425
Email: rojserkis@sanfordheisler.com

*Attorneys for Plaintiffs*

*pro hac vice forthcoming*

COMPLAINT